**Michael Lee WILSON, Petitioner,**

v.

**Steve WATTERS, Respondent.**

**No. 04–C–776–C.**

United States District Court,
W.D. Wisconsin.

Dec. 10, 2004.

Michael L. Wilson, pro se.

Charles D. Hoornstra, Assistant Attorney General, Madison, WI, for Defendant.

## ORDER

CRABB, District Judge.

This is a proposed civil action for monetary and injunctive relief, brought under 42 U.S.C. § 1983. Petitioner Michael Lee

Wilson is presently confined at the Wisconsin Resource Center as a patient pursuant to Wisconsin's Sexually Violent Persons Law, Wis. Stat. ch. 980. He seeks leave to proceed without prepayment of fees and costs or providing security for such fees and costs, pursuant to 28 U.S.C. § 1915. From the affidavit of indigency accompanying petitioner's proposed complaint, I conclude that petitioner is unable to prepay the full fees and costs of instituting this lawsuit. Because he is a patient and not a prisoner, petitioner is not subject to the 1996 Prison Litigation Reform Act.

In addressing any pro se litigant's complaint, the court must construe the complaint liberally. *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). However, pursuant to 28 U.S.C. § 1915(e)(2), if a litigant is requesting leave to proceed *in forma pauperis*, the court must deny leave to proceed if the action is frivolous or malicious, fails to state a claim on which relief may be granted or seeks money damages from a defendant who is immune from such relief.

In his complaint, petitioner alleges the following facts.

## ALLEGATIONS OF FACT

Petitioner Michael Lee Wilson is presently confined at the Wisconsin Resource Center as a patient pursuant to Wisconsin's Sexually Violent Persons Law, Wis. Stat. ch. 980. Prior to July 15, 2003, he had been confined at the Sand Ridge Secure Treatment Center in Mauston, Wisconsin. Defendant Steve Watters is the director of the Sand Ridge facility.

While petitioner was incarcerated at the Sand Ridge facility, he was enrolled in the Sand Ridge conventional treatment track program which was commonly referred to as the "Core" program. On May 13, 2002, petitioner was called into the office of Doug Belial, a manager of one of Sand Ridge's medium security units, where Belial told petitioner that he was being transferred to to High Management/Initial Unit AA (presumably from Belial's unit). The decision to transfer petitioner was made by the Sand Ridge treatment center clinical director, Dr. David Thorton, for the sole reason that petitioner had refused to take a polygraph examination. Petitioner had received a memo (presumably from an employee at the Sand Ridge center), indicating that refusing a polygraph exam would "NOT BE A GENERAL REFUSAL OF TREATMENT."

After petitioner was transferred to the High Management/Initial Unit, he was subjected to a more restrictive work policy, an earlier curfew and increased security restrictions. On May 18, 2002, petitioner and other similarly situated patients filed complaints about not receiving a hearing before they were transferred to a more restrictive unit. The Sand Ridge official stance was that these patients had opted out of treatment. During the grievance process, petitioner argued that he had not refused treatment and did not wish to refuse treatment. Linda Alsum–O'Donovan and respondent denied the complaints. Their decisions "boiled down" to denying petitioner treatment and placing him on a more secure unit.

On June 3, 2002, one of the Sand Ridge social workers, Ms. Wheeland, gave petitioner an "individualized treatment opportunity" which was designed to change petitioner's mind about submitting to a polygraph test. Petitioner refused to participate in the treatment session or sign a treatment form. On July 10, 2002, Wheeland again tried to hold an individualized treatment session with petitioner. This time, no mention of petitioner's refusal to take a polygraph examination was made. Petitioner provided Wheeland and the Sand Ridge clinical staff a written explanation of his reasons for refusing to

participate in this second treatment session and reiterated that he was not refusing treatment.

Approximately six months after being transferred to the high management unit, petitioner attended a staffing meeting at which patients and staff discuss treatment planning. The Sand Ridge treatment staff, including Steve Hamilton, a unit manager, informed petitioner that committees who scored above a twenty-five on a psychopathy test were eligible to be treated through the facility's "Corrective Thinking Program." The cut-off minimum score had just been lowered from thirty. Because petitioner's psychopathy score was a twenty-nine and because he had been having trouble in the Core program, the treatment team recommended that he be placed in the Corrective Thinking Program.. Petitioner rejected this recommendation, arguing that the only problems he was having in the Core program stemmed from his refusal to take a polygraph examination.

On July 15, 2003, petitioner was transferred to the Wisconsin Resource Center. He was not given a hearing before the transfer. Petitioner has fewer freedoms and privileges at the resource center than he had at the Sand Ridge facility. At the Wisconsin Resource Center, petitioner is not allowed to use as many electronic devices, he is charged higher canteen prices, made to wear prison clothing when visiting with friends and family, offered fewer recreational opportunities, and has less furniture and fewer electrical outlets in his cell than he had at Sand Ridge. Sex offender treatment is not offered to civil patients at the Wisconsin Resource Center.

Shortly after arriving at the Wisconsin Resource Center, petitioner began rethinking his position and came to the conclusion that he would rather be taking the corrective thinking program at Sand Ridge, even though it was inappropriate for him, than be housed at the Wisconsin Resource Center. Petitioner began negotiations with Scott Trippe, a psychologist at the resource center, attempting to arrange a return to Sand Ridge. Petitioner signed a new consent to treatment form and took several tests. Trippe told petitioner that several calls would have to be made to Sand Ridge before petitioner could be returned there.

Petitioner was presented with a new individualized treatment opportunity form, listing requirements necessary for his reinstatement in treatment program. The first three of these requirements were things petitioner had already done when he was still in the Core program. Requirements three through seven were designed to make petitioner prove he had the motivation and self-control that the Sand Ridge treatment staff thought was necessary for his participation in a treatment program. In addition, the Sand Ridge treatment staff expected petitioner to encourage other participants to participate appropriately and to generally be a role model. Petitioner was informed that the reason for these requirements was because he had interfered with other patients' treatment. Petitioner had not interfered with any other patient's treatment and he refused to participate in these individualized treatment opportunity requirements. Other patients were not made to meet these same requirements before receiving treatment. Petitioner remains at the Wisconsin Resource Center with no hope of receiving treatment, release or less restrictive confinement for the sole reason that he refused to take a polygraph examination.

## DISCUSSION

### A. *Due Process*

██ Unlike criminally confined offenders, who may be subject to punishment as

long as it is not cruel and unusual under the Eighth Amendment, persons civilly confined (including those confined under ch. 980) may not be punished. *Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Punishment of civilly confined patients violates their substantive due process rights under the Fourteenth Amendment. *Id.* However, ch. 980 patients "may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others." *Allison v. Snyder,* 332 F.3d 1076, 1079 (7th Cir.2003). The question is whether the conditions petitioner complains of are punitive.

■ In examining whether conditions of civil confinement are punitive, "courts must show deference to the judgment exercised by the qualified professional." *Youngberg,* 457 U.S. at 321, 102 S.Ct. 2452. Professional decision makers include persons "competent, whether by education, training, or experience, to make the particular decision at issue." *Id.* at 323 n. 30, 102 S.Ct. 2452. Decisions made by such professionals are "presumptively valid." *Id.* at 323, 102 S.Ct. 2452; *see also Barichello v. McDonald,* 98 F.3d 948 (7th Cir. 1996); *Estate of Cole v. Fromm,* 94 F.3d 254 (7th Cir.1996) (applying same standard to pretrial detainee committed to psychiatric ward).

Liability arises when the decision by the professional is such a departure from accepted professional judgment, practice or standards that it demonstrates that the person responsible did not base the decision on such judgment. However, even when the professional's decision deviates this far from accepted practice, liability will not lie if the decision was based on budgetary constraints; in such a situation, good faith immunity would bar liability. *Youngberg,* 457 U.S. at 320, 102 S.Ct. 2452.

I understand petitioner to allege that his due process rights were violated because he was a participant in a treatment program in which polygraph examinations are used, the alternative treatment program he was offered was inadequate and his placement in a more restrictive environment constitutes punishment. Before turning to the merits of petitioner's claims, I must address petitioner's failure to sue the appropriate party.

1. *Personal Involvement*

■ Petitioner has failed to allege any conduct on the part of respondent Watters except that he denied petitioner's grievance regarding his removal from the Core program. Liability will not lie for acts of a quasi-judicial nature. *Forrester v. White,* 484 U.S. 219, 226–27, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988); *Wilson v. Kelkhoff,* 86 F.3d 1438, 1443–1445 (7th Cir. 1996); *Borzych v. Frank,* 340 F.Supp.2d 955, 964 (W.D.Wis.2004) (denying grievances of confined persons is adjudicatory act). Throughout his complaint petitioner refers generally to the Sand Ridge treatment team. Respondent Watters cannot be held liable for the acts of any of the team members simply because he is the warden of the facility. Liability under § 1983 must be based on a respondent's personal involvement in the constitutional violation. *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995); *Del Raine v. Williford,* 32 F.3d 1024, 1047 ( 7th Cir.1994); *Morales v. Cadena,* 825 F.2d 1095, 1101 (7th Cir.1987); *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983). It is not necessary that the respondent participate directly in the violation. The official is sufficiently involved "if she acts or fails to act with a deliberate or reckless disregard of petitioner's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985). Nevertheless, in a § 1983 action, there is

no place for the doctrine of respondeat superior, under which a supervisor may be held responsible for the acts of his subordinates. *Gentry*, 65 F.3d at 561; *Del Raine*, 32 F.3d at 1047; *Wolf–Lillie*, 699 F.2d at 869.

In the caption of his complaint, petitioner has also indicated that his suit is against "those Persons acting in active concert or participation, or, any of their Successors, in their Personal and Official capacity." Ordinarily, a petitioner may request leave to proceed initially against defendants named as "John Doe" or "Jane Doe" when he does not know the names of the persons he wishes to sue. However, the petitioner must still allege how each Jane or John Doe was involved in the challenged actions or decisions. Here, however, it is clear that petitioner knows the names of the persons whose actions gave rise to this lawsuit. However, for what ever reason, petitioner has not named them as respondents. Ordinarily, I would allow petitioner an opportunity to amend his pleading to name a proper respondent. However, in this case, doing so would be futile because petitioner's allegations fail to make out a claim that his constitutional rights were violated.

2. *Polygraph Examination*

■ Petitioner contends that his due process rights were violated by the requirement that he take a polygraph examination in order to remain a participant in the Core treatment program. In *Allison v. Snyder*, 332 F.3d 1076, 1079–81 (7th Cir.2003), the Court of Appeals for the Seventh Circuit held that the use of polygraph tests as part of a sex offender treatment program does not violate due process. When treating civilly confined sex offenders, it is professionally sound for a state to use a treatment program premised on the notion that sex offenders may be better able to control the urges that drive their crimes if they admit and confront

those urges. *Id.* ("[i]t is not clearly established (indeed, it is not the law) that self-accusatory programs and polygraph machines are forbidden when treating sex offenders"); *see also McKune v. Lile*, 536 U.S. 24, 33, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) ("Research indicates that offenders who deny all allegations of sexual abuse are three times more likely to fail in treatment than those who admit even partial complicity."). Polygraph examinations help insure that participants are candid in admitting their crimes, to themselves as well as others. *Allison*, 332 F.3d at 1079. Moreover, unlike the Illinois statute involved in *Allison* which provided nothing that would prevent the states from using statement made in the program as confessions, *id.* at 1080, Wis. Stat. § 51.375(2)(b) provides that "the results of a lie detector test under this paragraph may be used only in the care, treatment, or assessment of the subject or in programming for the subject."

■ In support of its conclusion, the court of appeals cited *McKune*, 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47, in which the United States Supreme Court held that self-accusatory programs do not violate due process so long as participation in the program is voluntary. *Allison*, 332 F.3d at 1080. Treatment programs are considered voluntary even if a civilly committed person might have a more difficult time "show[ing] that their problems are behind them, that release is in order, and that the criminal charges [pending against them] should be dismissed." *Id.* Even if I were to accept as true petitioner's allegation that he was subject to more restrictive conditions solely because of his refusal to participate in a polygraph examination, the restrictions petitioner identifies are not sufficiently adverse to show that his participation was actually involuntary. *Cf. McKune*, 536 U.S. at 38, 122 S.Ct. 2017

(plurality), 536 U.S. at 49–50, 122 S.Ct. 2017 (O'Connor, J.) (transfer from medium security prison where treatment program offered to maximum security facility and resulting curtailment in visitation rights, television access, canteen expenditures and reduction in wages did not make treatment program participation compulsory).

### 3. *Treatment Learning Plan*

■ Petitioner alleges that the treatment learning plan offered to him is "inappropriate." Civil detainees are entitled to some kind of treatment although it need not be to the detainee's liking. *Allison*, 332 F.3d at 1079. Petitioner's claim fails because even if the treatment learning plan was inappropriate, the state has satisfied its due process obligations to petitioner by making the Core program available to him. I have already concluded that the Core program's use of polygraph examinations does not render the treatment program inappropriate. Petitioner does not suggest any other shortcoming in the Core program; in fact, he has alleged that it was an appropriate treatment program for him. Thus, there is nothing on the face of petitioner's complaint to suggest that the Core program was inadequate.

Petitioner's allegations make clear that the Core program was made available to him provided he participate in it fully; according to his complaint, the only reason he was removed from the Core program was because he refused to submit to a polygraph examination, which is a valid component of the program. Petitioner cites Wis. Stat. § 51.375(2)(b), which provides that a refusal to submit to a polygraph test "does not constitute a *general* refusal to participate in treatment." (Emphasis added). However, this provision does not limit the state from treating a refusal to take a polygraph examination as a refusal to participate in a *particular* treatment plan in which polygraphs are used. Petitioner is free to turn down the

treatment that is offered to him, *Allison*, 332 F.3d at 1080, but he cannot claim that his due process rights were violated therefore.

### 4. *Wisconsin Resource Center*

■ Finally, I understand petitioner to allege that his confinement at the Wisconsin Resource Center constitutes a due process violation. Pretrial detainees and civil committees may be assigned to prisons and subjected to the normal rules and regulations designed to advance security and safety without violating the due process clause. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Allison*, 332 F.3d at 1079. Petitioner does not allege that the conditions to which he is subjected (not being allowed to use as many electronic devices, being charged higher canteen prices, made to wear prison clothing when visiting with friends and family, offered fewer recreational opportunities and provided less furniture and fewer electrical outlets) are conditions different from those imposed on any other civil detainees at the resource center. Petitioner fails to state a claim that these restrictions violate his due process right to be free of punishment.

### B. *Wisconsin State Law*

Wisconsin law grants persons committed under ch. 980 the right to receive "adequate and prompt treatment ... appropriate for his or her condition under programs, services and resources that the county board of supervisors is reasonably able to provide within the limits of available state and federal funds and of county funds required to be appropriated to match state funds." Wis. Stat. § 51.61(1)(f). Petitioner claims that his right under this provision to "adequate and prompt treatment" has been violated. Because petitioner has not made out a claim

arising under federal law, I decline to exercise supplemental jurisdiction over his state law claims. *See* 28 U.S.C. § 1367(a) (district courts have supplemental jurisdiction over claims so related to claims in action that they form part of same case or controversy); *see also Groce v. Eli Lilly & Co.,* 193 F.3d 496, 500 (7th Cir.1999) (district court has discretion to retain or refuse jurisdiction over state law claims).

## ORDER

IT IS ORDERED that petitioner Michael Lee Wilson is DENIED leave to proceed in forma pauperis on his claims that he was deprived of his due process rights. Petitioner's state law claim is DISMISSED without prejudice to his refiling the claim in state court. The clerk of court is directed to enter judgment for respondent and close this case.