2024 IL App (2d) 240444-U
No. 2-24-0444
Order filed November 7, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 24-CF-1014 |
| ERVIN MARTINEZ MEJIA, | ) ) | Honorable Julia A. Yetter |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

*Held*:   We reverse the circuit court's orders denying defendants pretrial release and motion for relief where its findings regarding conditions of release were against the manifest weight of the evidence.

¶ 1     In this interlocutory appeal under Illinois Supreme Court Rule 604(h) (eff. Apr. 15, 2024), defendant, Ervin Martinez Mejia, appeals from the orders of the circuit court of Kane County granting the State's verified petition to deny his pretrial release under article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-1 *et seq.* (West 2022)), commonly known as the Pretrial Fairness Act (Act).   Defendant argues that the State failed to prove by clear and

convincing evidence that no condition or combination of conditions could mitigate the risk that his pretrial release would pose. We reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3     On May 17, 2024, defendant was charged with three counts of predatory criminal sexual abuse (720 ILCS 5/11-1.40(a)(1) (West 2022)) and three counts of aggravated criminal sexual abuse of a victim under 13 years old (*Id.* § 11-1.60(c)(1)(i) (West 2022)). On May 19, 2024, the State filed a verified petition to deny defendant pretrial release, arguing that defendant should not be afforded pretrial release due to the unmitigable threat he posed as well as his high likelihood of willful flight. The State's petition incorporated an Aurora Police Department synopsis sheet, which described how, on January 17, 2024, police had responded to defendant's complaint that his daughter, C.I.M, "had snuck out of their home and had not returned until the morning hours." Officers arrived at defendant's home, where his daughter informed them that defendant had been inappropriately "touching her intimate parts, specifically her vagina." The case was forwarded to the Kane County Child Advocacy Center (CAC) for investigation.

¶ 4     According to the synopsis, C.I.M. later informed CAC interviewers that defendant had been touching her vagina over her clothes since she was 10 years old, soon after her family had moved to Texas from Honduras. After the family moved to Aurora, the touching progressed. At one point, defendant had entered C.I.M.'s bedroom "and touched her vagina, under her skirt [and] under her underwear; and had also touched her breasts with his hands." At another point, during C.I.M.'s 12th birthday, defendant entered her bedroom in the early morning "and put his hand under her shirt and began rubbing her breasts." He "also removed her bottoms and put his hand inside her vagina, forcefully." C.I.M. asked what defendant was doing, and he responded that he was "checking to see if she was asleep." During another incident, defendant again entered C.I.M.'s

bedroom, "pulled down her shirt[,] and put his mouth on her breasts, while his hand was touching her vagina." The instances had always taken place in the early mornings while C.I.M.'s mother had been working a late shift. In fact, during a two-month period in which C.I.M.'s mother had not worked, defendant had not touched her at all. Apparently, the inappropriate touching had stopped once C.I.M. turned 13 years old, when her younger cousin had moved into the family home.

¶ 5    C.I.M. had reported the touching to her mother approximately four months prior to the interview, leading to a confrontation with defendant, in which defendant ultimately denied any inappropriate conduct. The synopsis further described CAC investigators' interview of defendant. Pertinently, defendant had denied all the accusations against himself. Also according to the synopsis, on April 10, 2024, C.I.M. ran away from her home once more. However, she later returned home "to attend [a] scheduled doctor's appointment."

¶ 6    The parties provided arguments as to the State's petition. For his part, defendant attacked C.I.M.'s credibility, portraying her outcry as being the dubious result of certain "issues" that had manifested once she began spending time with "bad influences." While C.I.M.'s penchant for running away may have seemed to be indicative of his wrongdoing, defendant pointed out that C.I.M. had continued running away even after defendant left the family home, following her outcry. Defendant also argued that, according to C.I.M., she had not been touched since "she has turned 13, which would have been in October of [the previous] year." Defendant had purportedly moved out of the family home after C.I.M.'s outcry, and "now resides in St. Louis where he has been working doing construction for the last five months." He had voluntarily returned in March 2024, however, in order to participate in the CAC interview. Defendant's other children, who were respectively eight and one years old, continued living with his wife, C.I.M.'s mother. Even more,

defendant had no criminal history.

¶ 7    Defendant argued that there were obvious conditions that could "be placed that would ensure the safety of the child" in the event of defendant's release. For instance, according to defendant, the court could order that he make "no contact with his 13-year-old daughter, the complaining witness in this case." Furthermore, "[electronic home monitoring (EHM)] would prevent him from returning to the address." The State responded, arguing that defendant's actual address was unclear, as he purportedly lived in St. Louis, even though he had been arrested "in the area." The State continued:

> "The fact is all kids under 18 are at risk, not just one daughter. So leaving him out of the house may protect her, but you heard testimony he has two other children. There was no indication of their ages,[1] but EHM is not going to keep him away from all minor children under the age of 18."

¶ 8    Following arguments, the court first found that "the proof is evident and the presumption is great that *** defendant committed the offenses as charged and that those offenses are detainable." The court further found that "defendant pose[d] a real and present threat to the safety of the minor child specifically and other minor children generally," and that "there is no condition or combination of conditions that can mitigate the real and present threat of safety to persons in the community or the victim in this case specifically." The court found that ambiguities concerning defendant's address to be relevant, as defendant had claimed to live in St. Louis yet "he was arrested on the [Illinois] warrant immediately," suggesting that he remained within the state and

---

[1]The State was mistaken, as defendant had already stated that his children were aged eight and one, respectively.

that his continued presence added to the threat of his prospective release. In its May 19, 2024, order, the court also found that defendant had a high likelihood of willful flight that could not otherwise be mitigated by conditions.

¶ 9 On June 11, 2024, defendant filed his amended motion for relief, challenging the court's ruling as to pretrial detention. During the hearing on the motion, defendant informed the court that he had a current address in Aurora, where he was living with an uncle. Nonetheless, the State argued that, even if defendant did have an address now for the purposes of EHM, the threat posed by his pretrial release remained because "[c]hildren can be brought to the home," and that the State would have no way to monitor whether defendant did in fact have access to any children while in Aurora. The State also cited *People v. Romine*, 2024 IL App (4th) 240321, for the proposition that "the evidence of a defendant's charged conduct, even if it took place on a single occasion, may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders or even societal norms regarding the safety of others if the defendant is placed on pretrial release." Thus, the State argued that defendant's charged conduct evinced an unwillingness to abide by any court orders that would otherwise mitigate the threat defendant's release posed.

¶ 10 After argument, the court reversed its earlier finding that defendant should be detained because he presented a high likelihood of willful flight to avoid prosecution. However, the court affirmed its earlier finding that no conditions could mitigate the dangerousness posed by defendant's pretrial release. The court first noted that defendant had no "history of contact with the criminal justice system." The court further noted that it did not "have any evidence that [defendant] would fail to follow orders of the court," but that it had "evidence to the contrary," as defendant had complied with all its directives without issue. Nonetheless, the court found that

conditions such as a stay-away order or EHM were insufficient "to safely ensure that those vulnerable members of [the] community are protected" from defendant. The court further agreed with the State's reliance on *Romine*, finding that some offenses "against a person" can represent "such an extreme departure from society's norm" that detention becomes necessary to ensure the safety of the public. Defendant was therefore ordered to remain detained pending trial.

¶ 11    Defendant timely appeals.

¶ 12                                II. ANALYSIS

¶ 13    Any person charged with a criminal offense in Illinois is eligible for pretrial release, as discussed by article 110 of the Code, as amended by the Act. 725 ILCS 5/110-1.5, 110-2(a) (West 2022). To overcome this presumption, the State must prove by clear and convincing evidence that the: (1) proof is evident or the presumption great that the defendant has committed a qualifying offense; (2) defendant poses a real and present threat to the safety of any person or the community; and (3) no conditions could mitigate the threat. *Id.* § 110-6.1(e).

¶ 14    We review the trial court's decision to deny pretrial release under a bifurcated standard, in which we review the court's factual findings—such as whether a defendant's pretrial release poses a threat or whether conditions could mitigate that threat—under the manifest-weight-of-the-evidence standard. *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13. However, the ultimate decision of whether a defendant should be denied pretrial release is reviewed for an abuse of discretion. *Id.* A court abuses its discretion in making arbitrary or fanciful determinations, or where no reasonable person would adopt the court's view. *Id.*

¶ 15    Here, defendant's sole contention is that the State failed to prove by clear and convincing evidence that no conditions of release would mitigate the threat he posed to the victim. We agree.

¶ 16    As we have noted *supra*, the Act presumes that *all* criminal defendants are eligible for pretrial release. 725 ILCS 5/110-1.5, 110-2(a) (West 2022); *Rowe v. Raoul*, 2023 IL 129248, ¶ 5. As part of its burden in overcoming this presumption, the State needed to show that "no condition or combination of conditions contained within section 110-10(b) of the Code can mitigate the real and present threat to the safety of any person or the community." 725 ILCS 5/110-6.1(e)(4)(i) (West 2022). The Act establishes mandatory and discretionary conditions that may be imposed on defendants on pretrial release, such as to "[r]efrain from approaching or communicating with particular persons or classes of persons," to "[r]efrain from going to certain described geographic areas or premises," or to be placed under pretrial home supervision. *Id.* § 110-10(b) (West 2022).

¶ 17    Here, as the court acknowledged, the record was devoid of any evidence suggesting that defendant would not comply with court orders setting conditions for his release. Even more, the court further admitted that the record evidence suggested that defendant *would* obey such orders, given his compliance with the overall investigation and court proceedings up until that point. Accordingly, the circuit court itself recognized that its judgment was contrary to the manifest weight of the evidence—indeed, all of the relevant evidence—showing that defendant would comply with any court orders establishing conditions for his release.

¶ 18    Despite examining the evidence to find that defendant would comply with its orders, however, and despite the availability of certain conditions that would prohibit defendant from contacting any minors, the court still found that pretrial detention was necessary to ensure the safety of the public. In support of its decision, the court relied on *Romine* to suggest that certain crimes—such as the ones charged here—are so outside the bounds of human decency that a perpetrator cannot possibly be expected to comply with any resulting court orders conditioning pretrial release.

¶ 19    In *Romine*, the fourth district affirmed the defendant's pretrial detention after he had been charged with first-degree murder, concealment of a homicidal death, aggravated unlawful use of a weapon, and aggravated fleeing and eluding a police officer. 2024 IL App (4th) 240321, ¶ 8. In affirming the defendant's detention on the grounds of dangerousness, the court noted:

> "Ultimately, the evidence of a defendant's charged conduct, even if it took place on a single occasion, may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders— or even societal norms regarding the safety of others—if the defendant is placed on pretrial release. The presumption in favor of pretrial release under the Act does not obligate a trial court to release such a defendant in the hopes that his otherwise spotless record will negate the real and present threat he poses to the safety of the community as shown by the State's evidence." *Id.* ¶ 20.

¶ 20    The court's reliance on *Romine*, which seemed to find that certain offenses are so heinous that the Act compels detention regardless of the attending circumstances, is misplaced. If the Act presumes that *all* criminal defendants are eligible for pretrial release, it is axiomatic that the bare allegations underlying the elements of any one offense, in and of themselves, do not warrant detention. See *People v. Stock*, 2023 IL App (1st) 231753, ¶ 17 (finding that more than the bare allegations that a defendant has committed an offense is required to show that no conditions could mitigate the threat posed by the defendant's release). Here, the court disregarded all the evidence showing that defendant would comply with its orders setting conditions on his release and ordered defendant's detention based solely on the bare allegations underlying the instant complaint. Because this decision—by the court's own admission—was contrary to the manifest weight of the

evidence, we must reverse and remand for a new hearing as to the applicable conditions for defendant's release.

¶ 21    We recognize that, for many, it may not seem just for us to order the pretrial release of defendant when it is uncontested that the proof is evident and the presumption great that he sexually abused his daughter. Such a reaction is not unreasonable, especially considering the high recidivism rate of sexual offenders, which the Supreme Court has characterized as "frightening" (*McKune v. Lile*, 536 U.S. 24, 32 (2002)), or the fact that, under the Act, nonviolent offenders are routinely jailed, typically as a flight risk. See *People v. Boncosky*, 2024 IL App (2d) 230496-U (pretrial detention affirmed after the defendant was charged with aggravated identity theft, theft, financial exploitation, and forgery); *People v. Sawyer*, 2024 IL App (2d) 240035-U (pretrial detention affirmed after the defendant was charged with possession of a controlled substance, possession of drug paraphernalia, and possession of methamphetamine); *People v. Wetzel-Connor*, 2023 IL App (2d) 230348-U (pretrial detention affirmed after the defendant was charged with manufacturing and delivering between 1 and 15 grams of cocaine).  However, "[t]he responsibility for the justice or wisdom of legislation rests upon the legislature," and "[a] court must interpret and apply statutes in the manner in which they are written. A court must not rewrite statutes to make them consistent with the court's idea of orderliness and public policy." *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394-95. Because the Act, as it is written, compels defendant's pretrial release, we are likewise bound to order that release.

¶ 22                                III. CONCLUSION

¶ 23    For the reasons stated, we reverse the order of the circuit court of Kane County granting the State's petition to detain and remand for a hearing to set proper conditions for defendant's pretrial release.

¶ 24       Reversed and remanded.