**IN THE COURT OF APPEALS OF IOWA**

No. 24-1738
Filed March 5, 2025

**IN THE INTEREST OF L.S.,**
**Minor Child,**

**A.F., Mother,**
　　　Appellant.

_____

　　　Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

　　　The mother appeals the termination of her parental rights. **AFFIRMED.**

　　　David R. Fiester, Cedar Rapids, for appellant mother.

　　　Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

　　　Julie F. Trachta of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

　　　Considered by Greer, P.J., and Langholz and Sandy, JJ.

**GREER, Presiding Judge.**

The juvenile court terminated the mother's parental rights to L.S., born in 2019, pursuant to Iowa Code section 232.116(1)(f) (2024).[1] On appeal, the mother challenges the juvenile court's conclusion the statutory ground was proved, arguing L.S. could have been returned to her custody at the time of the termination trial or, alternatively, that the Iowa Department of Health and Human Services (the department) failed to make reasonable efforts at reunifying her with the child. She also argues that the loss of her rights is not in the child's best interests because of the bond the two share.[2]

**I. Background Facts and Proceedings.**

The department became involved with this family in March 2023 after it was alleged the mother was seen on video injecting L.S.'s younger sibling, M.S., with unprescribed insulin while he was a patient in the hospital. At the time, the mother and father were no longer in a relationship; the mother was the children's main caregiver, though L.S. and the father sometimes spent weekends together.

Based on the allegations against the mother, L.S. was removed from her care and custody; the child remained in the father's custody and was placed in his

---

[1] In separate proceedings, the juvenile court also terminated the mother's parental rights to L.S.'s sibling, M.S. The juvenile court held separate termination trials and issued termination orders at different times. The mother appealed the termination of her rights to each child. We also file a ruling regarding the mother's rights to M.S. today. *See In re M.S.*, No. 24-1688, 2025 WL _____, at *_ (Iowa Ct. App. Mar. 5, 2025).

[2] The State never sought to terminate the father's parental rights; L.S. remained in the father's care and custody at the time of the termination trial (with department supervision).

care subject to department supervision.[3]   The mother consented to L.S.'s continued removal from her care and for the child to be adjudicated in need of assistance (CINA).

The department eventually entered a founded child abuse report against the mother regarding the injection of insulin.  Separately, the mother was criminally charged with two felonies: child endangerment causing serious injury and administering harmful substances.[4]   According to the department's social investigation report assessment:

> The team of doctors and social workers reviewed the [mother's] questions.  All medical professionals present at this meeting stated that none of these concerns, presented by [the mother], would explain the high insulin levels and the corresponding undetectable C-peptides.  They all agreed that the[] only way for [M.S.] to have the insulin and C-peptide levels that he had, was for someone to be giving him an outside source of insulin.
> They explained that Insulin and C-peptides go hand in hand. They explained that it [is] like taking a stick and breaking it in half. One of the halves would be insulin—the other would be C-peptide. Basically, the levels should almost be at a one to one ratio.  [M.S.'s] levels were way off.  The diagnosis that they have given is Fictitious Hypoglycemia.  The team also believes that [M.S.] received multiple doses of insulin to be affected as he was.  They believe that they can confirm that exogenous insulin was given to [him].  The person that had access to him at most times was his mother.  They also stated that a nurse found an insulin pen in [M.S.'s] bed on level 10—after he had been transferred to the PICU [when he experienced the hypoglycemic reaction].  The nurse stated that when the nurse asked what it was, [the mother] claimed that it was hers.  [M.S.] has two medications that come in a pen.  He has a Gvoke and his HGH that come in a pen.  However, the description of the pen does not match what the nurse found in [M.S.'s] bed.

---

[3] The father informed the department that he was unable to provide M.S.'s care because of the child's special needs.  M.S. was removed from both parent's custody and care and, eventually, placed with a foster family.

[4] As of the termination trial in June 2024, the mother's criminal charges were still pending.  The mother testified she also challenged the child abuse report, which was also still pending.

When the mother was questioned by an investigative social worker and by local police officers, she told inconsistent versions of what took place. At various times, the mother denied giving M.S. any injection, admitted giving him an injection of a prescribed steroid rather than insulin, claimed she was using water to flush M.S.'s feeding tube, and stated she was taking M.S.'s rectal temperature.

The mother participated in fully supervised visits with L.S. until they were temporarily suspended in October after L.S. returned from a visit with a medical syringe (without a needle) and medical grade lubricant. Visits resumed for a short window but were held in the community rather than the mother's home.

Then, in the lead up to the permanency review hearing, the GAL filed a report raising concerns about the mother's continued involvement with L.S. In the GAL's November 1 statement to the court, she stated:

> [L.S.'s] play therapist reports she is very concerned about [L.S.'s] emotional and mental well-being, and the impact ongoing contact with [the mother] is having on her. When visits with [the mother and L.S.] were suspended for three weeks, [L.S.] was noted to be calmer and more well-adjusted. When visits resumed, she immediately displayed acting out behaviors. Even with a provider and nurse present, there continue to be concerns during visits. The children are giving direct signs of their discomfort during visits and interactions with [the mother]. It is not in their best interest to continue to force them to have interactions with [the mother].

In its November 3 permanency review order, the juvenile court temporarily suspended the mother's visits with L.S. pending a later contested hearing.

The contested hearing took place on December 11 and 18.[5] In its written ruling, the court suspended the mother's visits, concluding they were "clearly harmful to the children." The court explained:

---

[5] We do not have a transcript of this proceeding.

Visits between the mother and the children have remained fully supervised throughout this case. Visits were suspended in the fall for approximately three weeks after [L.S.] had brought a medical syringe and a tube of medical grade lubricant home from her mother's house after a visit. Thereafter, visits have been in the community or the provider office. On November 2, 2023, the Court again suspended visits pending contested hearing due to concerns for the children's physical, mental and emotional health. [The daycare director] where [L.S.] attends daycare, testified that [L.S.'s] behaviors changed after visits with her mother resumed. [L.S.] was exhibiting disruptive behavior, was obstinate, and was not sleeping during naps. [L.S.] was also having accidents (not making it to the bathroom) when visits were occurring. It would take her two to three days to regulate once she had a visit. [The daycare director] noted that since the visits have been suspended again, her behaviors have stopped. In fact, the day after visits were suspended, [L.S.] slept through her nap and was cooperative the whole week. [L.S.] had also told her in October that she didn't see her mom all the time because her mom had hurt her and her brother and it "made her sad."

[L.S.'s] play therapist, Kim Korte, testified that she has been seeing [L.S.] weekly since August. She unequivocally recommended that visits between [L.S.] and her mother stop at this time. She noted that in sessions, [L.S.] can become quite distressed exhibiting trauma responses and is either numb or hyper and silly. She has displayed avoidance, emotional dysregulation, high anxiety and high stress. [L.S.] has a pattern of "feeding" baby dolls with a bottle that she says is hot sauce, pee and poo, then says it's a "secret" and shuts down. On one occasion, [L.S.] said that her mom hurt her brother, then shut down and wanted to end the session. Ms. Korte saw a lot of distress and emotional dysregulation at that time. Notably, she has noted a change in [L.S.] since visits have been suspended again. She testified that [L.S.] is now calm and regulated and has been very happy and bright. Ms. Korte recommends that [L.S.] be allowed the opportunity to work through her trauma without visits so that she is not further traumatized until she has processed the trauma. She believes that the mother needs to be in therapy at the same time so that she will then be able to provide [L.S.] what she needs emotionally and physically. Ms. Korte recommended that once [L.S.] has addressed her trauma, therapy with mom should occur to ensure that she is ready to meet [L.S.'s] needs, then they should begin family therapy. It would be detrimental to force [L.S.] to have visits at the time and would damage her trust in adults. [L.S.] cannot heal if she doesn't feel safe.

[The department case manager] testified that at a visit she attended, mom was very controlling and wouldn't let [M.S.] be interactive. She noted [M.S.] had a very flat affect with his mom. It was very concerning to her that the mother chose to feed [M.S.] a

hot dog when it was not on the list of foods that he could have especially given that his diet was very "liquid-y" at the time with only pureed foods being given. [The case manager] testified that the mother also interferes with the child's physical therapy and occupational therapy appointments. The mother checks [M.S.'s] "my Chart" [online medical chart] multiple times a day and thinks that the doctors are withholding information from her. Further, the mother has scheduled both children for medical appointments and tests that have been unnecessary.

[The case manager] also relayed an interaction she had with [L.S.] in which [L.S.] threw a [Care Bear] against a wall stating, "mommy [mother's name] hurts babies." After visits were suspended then reinstated, the mother was not allowed to take [L.S.] to the bathroom alone after [L.S.] stated that her mother wiped her too hard and she was sore in her private area. [The case manager] recommended that the mother's visits remain suspended and also testified that [M.S.] is blossoming since visits have been suspended.

The mother also testified. The Court found the mother had an answer for all of the concerns that had been brought forth but did not find these explanations to be believable. In fact, the Court is very concerned that the mother has absolutely no insight into the concerns presented. The actions of the mother in many instances have put her children in danger, especially [M.S.] who has many special needs. It appears to the Court that the mother seeks attention through her medical needs and those of her children, whether real issues or those brought to medical professionals solely by mother's report. She is placing her children in danger through those actions as well as the behavior described by [the case manager] and alluded to by [L.S.] in daycare and in therapy sessions. Most important, the testimony by Ms. Korte and [the daycare director] was incredibly persuasive in determining that [L.S.] is experiencing emotional and mental harm from visits with her mother.

Visits remained suspended through the termination trial, which took place on June 4 and 5, 2024.

At trial, the mother continued to maintain she never injected M.S. with insulin. And she asserted the case was a mistake and that she had not done anything that would require the department and juvenile court to be involved with the family. The mother testified that she completed mental-health and psychological evaluations, as required by the court, and attended therapy. She

was "working on the emotion effect that this case has played."  But, because she consistently denied harming her children, she was not addressing the department's underlying concerns in therapy.

L.S.'s therapist, Kim Korte, also testified at trial.  Korte had been providing therapy for L.S. since August 2023 for a total of thirty-two sessions.  Korte explained the positive changes she witnessed in L.S. since visits with the mother were suspended, testifying:

> So she is more regulated.  She is less avoidant and can tolerate talking about her past, talking about feelings.  She can tolerate talking about mom, talking about her past, without having to stop the play or stop our conversation, ignoring me.  She'll actually, on her own, bring up mom or brother [M.S.] so she can be present in my office.  We can talk and we can play.  She's appropriate, she doesn't show signs of distress when those things are brought up.

While L.S. had made positive progress, the therapist recommended that visits with the mother not restart:

> [L.S.] continues to have that conflicting message of why would a mom be mean?  And so she's very stuck there, and that leads me to believe that she would not feel safe, because she's still conflicted and still scared of being hurt or being in a situation where she would be unsafe, or her brother would be unsafe.

The juvenile court issued its written termination order in October 2024, granting the petition to terminate the mother's parental rights to L.S. under Iowa Code section 232.116(1)(f) (2024).  The court ruled:

> The main concern throughout this case was the emotional trauma and abuse [L.S.] endured while in the care of her mother. [The case manager] testified that she met with [L.S.] monthly, and each month [L.S.] opened up more to her.  At one visit, [L.S.] told her the "Mommy [mother's name] hurts babies."  She was playing with her dollhouse and her [Care Bears] at the time.  When she made that statement, she threw a [Care Bear] that she identified as "Mommy [mother's name]" against the wall.  At another visit, [L.S.] told her that Mommy [mother's name] hurt M.S.  As [L.S.] got more comfortable

with [the case manager], [L.S.] told her that "[mother's name]" hurt her and M.S. It was notable to [the case manager] that [L.S.] changed from addressing her mother as Mommy [mother's name] to [mother's name]. [The case manager] testified that she believed that [L.S.] became more open and more comfortable due to finally feeling safe.

[The case manager] also testified that [L.S.] had told her that her mother made her stay in a crib. [L.S.] was given an iPad to keep her busy but was told that she had to stay in the crib. [The case manager] testified that she was concerned that this occurred at an age that [L.S.] could remember that it occurred and that she was traumatized from the incident. She was also very concerned that [L.S.'s] needs were not being met at that time.

. . . .

Throughout [the mother's] testimony, she did not acknowledge any of the fears her daughter had nor that she had created any trauma to [L.S.] through her actions. In fact, she testified about what a close relationship they had. [The mother] exhibited a flat affect at times but also appeared to be acting as the victim many times. She gave different versions of events and was not credible due to the many discrepancies and changes in her stories. The Court does not believe that this mother is a victim, rather her daughter is the victim of her serious mental health issues that have caused [L.S.] mental and emotional harm.

. . . .

[L.S.] remains in the care and custody of her father. She is thriving and is a different child than when the case first opened due to feeling safe and no longer experiencing any abuse or trauma. She sees her brother frequently and is bonded with him. That relationship should continue as it is important to both children.

The mother appeals.

**II. Standard of Review.**

"In termination-of-parental-rights cases, we review the proceedings de novo." *In re R.M.-V.*, 13 N.W.3d 620, 624 (Iowa Ct. App. 2024) (citation omitted). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *Id.* (citation omitted).

**III. Discussion.**

The juvenile court terminated the mother's parental rights to L.S. under section 232.116(1)(f), which allows termination when

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The mother challenges only the fourth element—whether L.S. could be returned to her custody at the time of the termination trial. *See In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpreting "at the present time" to mean at the time of the termination trial). As part of this challenge, the mother argues the State failed to make reasonable efforts to return L.S. to her custody and points to the suspension of her visits with the child. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("[T]he State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent."); *In re C.G.*, No. 23-1234, 2024 WL 260926, at *1 (Iowa Ct. App. Jan. 24, 2024) (recognizing that "[a]t its core, a parent's reasonable-efforts challenge functions as a challenge to a component of the statutory grounds").

We understand the mother's "reasonable efforts" argument to be an assertion that the court wrongly allowed the department to suspend her visits with L.S. in November 2023, which negatively impacted her ability to reunify with the child leading up to the termination trial. The mother resisted the department's

request to suspend her visits and participated in a contested hearing on the issue. In its November permanency order, the juvenile court determined that the department had made reasonable efforts and listed those efforts provided. As far as we can tell, the mother never framed the issue as involving "reasonable efforts," but we think she did enough to preserve error on the claim.

Still, we cannot reach the merits of the mother's argument that the juvenile court was wrong to suspend visits because we do not have a transcript of the contested hearing. Without it, we cannot review the evidence upon which the juvenile court made its decision. "If the appellant intends to argue on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the record on appeal must include a transcript of all evidence relevant to such finding or conclusion." Iowa R. App. P. 6.803(1). "It is the appellant's duty to provide a record on appeal affirmatively disclosing the alleged error relied upon." *In re F.W.S.*, 698 N.W.2d 134, 135 (Iowa 2005). And the failure to provide the record prevents us from deciding in the mother's favor on this issue. *See id.* at 135–36.

While bypassing the mother's reasonable-efforts challenge, we consider whether the State proved L.S. could not be returned to the mother's custody at the time of the termination trial. The mother notes that she followed court orders, obtaining mental-health and psychological evaluations and participating in therapy as required. She complains that, despite this, the court and the department decided she was unsafe because she refused to admit to her treatment providers that she injected L.S.'s sibling with insulin. She suggests this is a violation of her constitutional right against self-incrimination. *See* U.S. Const. amend. V. But this

argument fails. First, the mother never invoked her Fifth Amendment right; she has steadfastly maintained she did not inject M.S. with insulin (even while her explanation of what the video shows varies). And second, even if she invoked her Fifth Amendment right, that does not free her from the consequences that follow for failure to take responsibility for her actions. *See In re R.B.*, 832 N.W.2d 375, 378 (Iowa Ct. App. 2013) ("[T]he government need not make the exercise of the Fifth Amendment privilege cost free." (quoting *McKune v. Lile*, 536 U.S. 24, 41 (2002))). While "[t]he State may not penalize [the mother] for noncompliance with a court order impinging on [her] right against self-incrimination," "this is as far as the Fifth Amendment privilege extends." *In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002). "A parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children." *Id.* "These consequences lie outside the protective ambit of the Fifth Amendment." *Id.* (citation omitted). The mother may have been faced with a dilemma regarding whether to speak honestly with her treatment providers, but that dilemma does not trigger constitutional protection. *See id.*

While the mother attended therapy, she did not complete any treatment to address the underlying issues that led to department's and juvenile court's involvement with the family. And the concerns were not limited to M.S. but related to safety issues over L.S.'s care. So, L.S. could not safely be returned to the mother's custody at the time of the termination trial. *See id.* at 151 (finding that because the father "fail[ed] to complete any form of treatment, we cannot conclude [he] has fixed his problems and is now fit as a parent"); *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988) (noting "the requirement that the parents acknowledge

and recognize the abuse before any meaningful change can occur is essential in meeting the child's needs"); *In re E.S.*, No 23-0544, 2023 WL 3335326, at *2 (Iowa Ct. App. May 10, 2023) (affirming termination of parental rights when children were removed from father's custody after a child protective assessment found the father sexually abused an older half-sibling and the father "completed mental-health and psychosexual evaluations [but] did not follow through with the recommended intensive treatment and continued to deny the abuse occurred").

Next, the mother argues termination of her parental rights is not in L.S.'s best interests. In making this determination, we use the structured best-interests framework provided in Iowa Code section 232.116(2). *See In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010) (requiring the court to "base its best-interest determination on the legislative requirements contained in section 232.116(2), rather than upon the court's own value system"); *see also* Iowa Code § 232.116(2) (requiring the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child"). "[A] child's safety and his or her need for a permanent home [are] the defining elements in a child's best interests." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted). And we consider "the child's long-range as well as immediate interests." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (citation omitted). The mother cannot provide L.S. with the safe home that she needs and deserves. While the mother participated in some therapy during the more than fourteen months between when L.S. was removed from her care and the termination trial, she did not address the issues that led to department involvement. By the time of the June 2024 termination trial,

the mother had not seen L.S. in approximately seven months. And by all descriptions, L.S. was thriving outside of her mother's care and presence. Termination of the mother's parental rights is in L.S.'s best interests.

Finally, the mother argues we should forego termination because there is clear and convincing evidence that the loss of her rights would be detrimental to L.S. due to the closeness of the parent-child relationship. *See* Iowa Code § 232.116(3)(c). The mother recognizes that the bond between her and L.S. had suffered by the time of the June 2024 termination trial—more than six months after visits between L.S. and the mother were suspended. But she suggests that because those visits were wrongly suspended, we should not discount the bond they shared earlier in L.S.'s life, when the mother was the child's main caretaker. As the parent resisting termination, the mother has the burden to show application of this permissive exception is warranted. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). And she has not done so; L.S.'s long-term needs outweigh the hardships of termination. We decline to apply a permissive exception to save the parent-child relationship.

We affirm the termination of the mother's parental rights to L.S.

**AFFIRMED.**